## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**DERRICK X SHIELDS**                                                    **PETITIONER**

**V.**                                    **NO. 5:18-CV-00265-BSM-ERE**

**JERRY BRADSHAW, Director,**
**Arkansas Division of Community Correction[1]**                    **RESPONDENT**

### RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the entry of this Recommendation. The failure to timely file objections may result in waiver of the right to appeal questions of fact.

---

[1] Originally, Mr. Shields named James Gibson, Warden, Arkansas Division of Correction, as the respondent in this case. After his parole, he moved to substitute James Gibson with Wendy Kelley, then the Director of Arkansas Department of Correction, and Kevin Murphy, then the Director of the Department of Community Corrections. *Doc. 24*. Because Mr. Shields is currently on parole, the proper respondent is "the particular probation or parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate." Rule 2(b), Rules Governing Section 2254 Cases in the United States District Courts (Advisory Committee Note to Rule 2(b)). The Clerk is directed to substitute Kevin Murphy with Jerry Bradshaw, the Director of the Arkansas Division of Community Correction, as the respondent in this case.

## I.    BACKGROUND

Petitioner Derrick X. Shields filed the pending petition (*Doc. 1*) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 while incarcerated at the Varner Unit of the Arkansas Department Correction, and he filed the amended petition (*Doc. 10*) after he was released on parole. The case is before the Court pursuant to Judge Miller's order entered November 12, 2020 (*Doc. 52*), remanding the case for further consideration, in light of the expanded record, to determine whether Mr. Shields has shown cause and prejudice or actual innocence sufficient to overcome procedural default.

After carefully reviewing the entire record, the Court finds that Mr. Shields has failed to demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law," *Coleman v. Thompson,* 501 U.S. 722, 729-30 (1991), or that failure to consider his claims will result in a fundamental miscarriage of justice, such as the conviction of one who is actually innocent. See *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995).  The Court therefore recommends dismissal of the petition and amended petition, with prejudice.

### A.    Procedural Background

On November 18, 1999, when Mr. Shields was fourteen years old, three juveniles robbed the Movie Magic video store in Blytheville, Arkansas.  *Shields v. State*, 357 Ark. 283, 285 (2004). In the course of the robbery, the store clerk, Laurie

Troup, was shot and killed. *Id*. Later that night, investigators questioned Mr. Shields and tested him for gun powder residue, but they did not charge him with a crime. *Id*.

In March 2001, when Mr. Shields was fifteen years old, he provided a statement to detectives, admitting his role in the Magic Movie crimes. *Shields*, 357 Ark. at 285-296. On April 18, 2001, the State charged Mr. Shields, as an adult, with aggravated robbery and capital felony murder—a killing in the course of aggravated robbery. *Doc. 29-2 at 5*.

Before trial, Mr. Shields move to suppress his confession, arguing that detectives had not advised him of his *Miranda* rights in compliance with procedures mandated under an Arkansas statute enacted in 2001, which required officers to explain *Miranda* rights "in the juvenile's own language" and permit a parent's presence during questioning. *Shields*, 357 Ark. at 285 (citing Ark. Code Ann. § 9-27-317(a)(2)(A) (Repl. 2002)). Mr. Shields also argued that his youth and asserted low intelligence prevented him from understanding and effectively waiving his rights. *Doc. 29-2 at 11-12*.

After a hearing at which Mr. Shields and his father testified, the trial court denied his motion to suppress, finding that the recently enacted statute did not apply. *Doc. 29-2 at 33-37*. The trial court further found that: (1) Mr. Shields had not requested a parent's presence during questioning; (2) he possessed sufficient

intellect to understand and knowingly waive his *Miranda* rights; and (3) he effectively waived those rights. *Doc. 29-2 at 73*.

On April 17, 2003, a Mississippi County jury convicted Mr. Shields, then sixteen years old, as charged. *Shields,* 357 Ark. at 285.  Despite his young age, his conviction for felony capital murder carried a mandatory sentence of life imprisonment without the possibility of parole. See Ark. Code Ann. § 5-4-104(b) (1997) (limited on constitutional grounds by *Miller v. Alabama*, 567 U.S. 460 (2012) and amended by 2021 Arkansas Laws Act 1102 (H.B. 1934)).

On direct appeal, Mr. Shields claimed that the trial court erred by: (1) denying his motion to suppress; (2) excluding evidence that Laurie Troup's father was a drug informant; and (3) allowing testimony about a note that a detective found during a search of Mr. Shields' bedroom. *Shields v. State*, 357 Ark. at 287-290. The Arkansas Supreme Court affirmed Mr. Shields' conviction.  *Id*. at 290.

Mr. Shields did not petition the United States Supreme Court for a writ of certiorari, nor did he file a petition for post-conviction relief under Rule 37 of the Arkansas Rules of Criminal Procedure.

In 2004, Mr. Shields filed his first § 2254 petition for habeas corpus relief in this Court, raising the same claims he had pursued on direct appeal. *Shields v. Norris*, No. 5:04-cv-00344-JHL, 2007 WL 2154175, at 3 (E.D. Ark. July 24, 2007). This Court denied the petition, finding that the Arkansas Supreme Court's decision

affirming Mr. Shields' conviction was neither contrary to nor an unreasonable application of federal law. *Id.* Mr. Shields did not appeal.

In 2016, Mr. Shields filed a petition for habeas relief in state court, seeking vacatur of his life sentence and resentencing, pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). *Doc. 29-13*. Mr. Shields prevailed. On October 20, 2017, pursuant to an agreement between Mr. Shields and prosecutors, the trial court resentenced him to 336 months' imprisonment, with eligibility for parole after serving fifty percent of the sentence. *Doc. 29-15.*

On October 19, 2018, within one year of the resentencing order, Mr. Shields initiated this habeas action (*Doc. 1*).[2] On February 11, 2018, after serving nearly 18 years in prison, Mr. Shields was released on parole (*Doc. 24*), and on November 9, 2018, he filed an amended petition in this case, restating his original claims and adding additional ineffective-assistance-of-counsel claims. Mr. Shields' claims, in total, are these:

(1) He is actually innocent;[3]

---

[2] Judge Miller has ruled that the state resentencing order qualifies as a new judgment for purposes of the Antiterrorism and Effective Death Penalty Act, thus resetting the one-year statute of limitations. *Doc 15.* Judge Miller has also determined that Mr. Shields' petition is not successive and that he may challenge his underlying conviction without first obtaining permission from the Eighth Circuit. *Id.*

[3] *Doc. 10 at 30-59.* In addition to asserting that he has established his actual innocence as a gateway claim to have his constitutional claims considered on the merits, Mr. Shields asserts a freestanding claim that he is actually innocent of aggravated robbery and murder. In a recommended disposition issued March 6, 2020 (*Doc. 34*), United States Magistrate Judge Beth Deere explained that the Supreme Court has not resolved whether such a claim is even cognizable. *Doc. 34 at 19* (citing *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)). Even if such a claim were cognizable, Mr. Shields' failure

(2) State prosecutors violated his Fourteenth Amendment right to due process by soliciting and presenting false evidence and failing to correct false evidence in the record;[4]

(3) His trial counsel violated his Sixth Amendment right to effective assistance of counsel by:

> (a) failing to investigate and present potentially exculpatory testimony from Marie Jackson, the mother of codefendant Kuntrell Jackson, [5]

> (b) failing to adequately investigate and present an alibi defense and potential defense witnesses,[6]

> (c) failing to adequately investigate and challenge his confession, both before and during trial,[7]

> (d) failing to investigate the unreliability of codefendant Travis Booker's statement to law enforcement and impeach his testimony,[8]

> (e) failing to investigate and present evidence of his innocence,[9] and

> (f) failing to adequately investigate and present evidence that Mario "Bowlegs" McNichols, not Mr. Shields, was an accomplice to the underlying robbery and murder.[10]

On June 19, 2019, Respondent filed a response, arguing that (1) Mr. Shields'

ineffective assistance of counsel claims raised for the first time in the amended

---

to establish actual innocence sufficient to excuse his procedural default means that he cannot make the "extraordinarily high" showing required to establish a free-standing actual innocence claim. *Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014) (citations omitted).

[4] *Doc. 11 at 59-64.*
[5] *Doc. 10 at 68-72.*
[6] *Doc. 10 at 72-73*
[7] *Doc. 10 at 73-93.*
[8] *Doc. 10 at 93.*
[9] *Doc. 10 at 93-94.*
[10] *Doc. 10 at 94.*

petition are time-barred,[11] (2) Mr. Shields' claims are barred under the abuse of the writ doctrine,[12] (3) Mr. Shields is not entitled to relief on a freestanding claim that he is actually innocent,[13] and (4) Mr. Shields' claims are procedurally defaulted and unexcused by either cause and prejudice[14] or actual innocence.[15]

On March 6, 2020, United States Magistrate Judge Beth Deere issued a recommended disposition (*Doc. 34*), recommending dismissal with prejudice on the ground that Mr. Shields had failed to show cause and prejudice or actual innocence to overcome his conceded procedural default.

Mr. Shields filed objections (*Doc. 43*) along with two, never-before-filed declarations (*Doc. Nos. 43-1, 43-2*). He also submitted audio and video recordings containing substantially the same information that he had provided with his amended petition and which Judge Deere addressed in her recommendation. In addition, Mr.

---

[11] *Doc 29 at 5-7.* Judge Deere found that Mr. Shields' ineffective assistance of counsel claims, asserted for the first time in the amended petition, were timely because they arose from the same "conduct, transaction, or occurrence" as those raised in the original petition and therefore relate back to the date of the original petition, as required under Rule 15(c) of the Federal Rules of Civil Procedure. *Doc. 34 at 8-13.* Given Judge Miller's instructions on remand, it does not appear that the timeliness of Mr. Shields' amended claims remain at issue, but to the extent the issue remains, this Court agrees with Judge Deere's analysis and recommends the same.

[12] *Doc. 29 at 27-29.* Judge Deere declined to address this claim, stating: "Considering Judge Miller's rulings that the petition is not successive and his finding that Mr. Shields may challenge his underlying conviction and not merely his new sentence, the Court declines Respondents' invitation to apply the abuse-of-the-writ doctrine." *Doc. 34 at 5 n.3.* This Court also declines to apply the abuse-of-the writ doctrine in this case.

[13] *Doc. 29 at 29.*

[14] *Doc. 29 at 29-36.*

[15] *Doc. 29 at 7-27.*

Shields filed a motion for discovery (*Doc. 41*) and a motion to expand the record to include the exhibits that he had submitted with his objections. *Doc. 42.*

By order entered November 2, 2020, Judge Miller rejected Judge Deere's recommendation, granted the motion to expand the record, and denied the motion for discovery. *Doc. 52.* Noting that "[t]he merits of Shields' habeas petition cannot be heard unless he overcomes procedural default[,]" Judge Miller remanded the case for reconsideration "in light of the expanded record" to determine whether Shields has shown cause and prejudice or actual innocence sufficient to overcome procedural default. *Id*.

### B.    Factual Background

The evidence presented at Mr. Shields' criminal trial established the following facts. During the early evening of November 18, 1999, Mr. Shields, Kuntrell Jackson, and Travis Booker, all juveniles at the time, walked to the Movie Magic video store in Blytheville, Arkansas, armed with a sawed-off shotgun and a plan to "do a lick," i.e., rob the store. They demanded money from the store clerk, Laurie Troup, and when she did not comply, one of them shot her in the face, and the trio immediately fled the store with no money.

Sometime after 8:00 p.m., Laurie Troup's mother and son arrived at Movie Magic to keep her company, and they discovered her lying on the floor behind an open cash register. *Doc. 29-2 at 210.* Ms. Troup was bleeding and unconscious but

still alive, and her son ran outside to alert a police officer, who called an ambulance. *Doc. 29-2 at 210-211*. Troup died later that night as a result of the gunshot, which had penetrated her brain through her left eye. *Doc. 29-2 at 211*, *536*.

At approximately 11:00 p.m. that night, a detective arrived at Mr. Shields' house and took him to the police station for a gun residue test (*Doc. 29-2 at 354*), which was administered at approximately 12:00 a.m. (*Doc. 29-2 at 249*).[16] Months later, the  results of the test returned negative.  (*Doc. 29-2 at 250-251, 541)*.

On March 26, 2001, Mr. Shields' father surrendered him at the Blytheville Police Department on an arrest warrant for a burglary unrelated to the Movie Magic robbery and murder. (*Doc. 29-2 at 284, 287*).  Detective Scott Adams questioned Mr. Shields four times over a two-day period: March 26 and 27, 2001. Before each interrogation, Adams provided Mr. Shields a waiver of *Miranda* rights form, which he read aloud to Mr. Shields. (*Doc. 29-2, at 252, 298, 301, 303*). Mr. Shields signed each form, under the following statement:

> I have read this statement of my rights and understand what my rights are.  I am willing to make a statement and answer questions.  I do not want a lawyer at this time.  I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

---

[16]  Dr. Frank Perettti, a medical examiner, testified that the preferred practice is to conduct a gunshot residue test soon after the commission of a crime.  *Doc. 29-2 at 250*.  He explained that "gunshot powder or residue . . . will leave the hand, can be transferred to other items, or if a person washes their hands or sweats, [it can] remove the gunshot residue." *Id.*

*Doc. 29-2, at 474, 476, 478, 480.*

Adams conducted the first interview on March 26, 2001, a few hours after Mr. Shields arrived at the police department. *Doc. 29-2 at 285-286.* After questioning Mr. Shields about the burglary, Adams obtained consent from Mr. Shields' father to search his residence. *Doc. 29-2 at 287.* During the search, Adams found a note in Mr. Shields' bedroom, which Adams believed described a plan for a robbery. *Doc. 29-2 at 297.*

After returning to the police department, Adams discussed the note with his supervisor, detective Ross Thompson. *Doc. 29-2 at 289.* Unlike Adams, who worked as a patrol officer when the Movie Magic crimes occurred (*Doc 29-2 at 284*), Thompson participated in the Movie Magic robbery and murder investigation. *Doc 29-2 at 312.*

After talking to Thompson, Adams interviewed Mr. Shields a second time on March 26. First, he inquired about the note he found in Mr. Shields' bedroom. Then, he initiated a discussion about the Movie Magic robbery and murder,[17] during which Mr. Shields implicated Kuntrell Jackson and mentioned a specific weapon: a 410

---

[17] Mr. Shields claims that the prosecution presented false evidence that Mr. Shields, not Adams, first raised the subject of the Movie Magic crimes in order to offer Adams information as a way to escape prosecution. *Doc. 10 at 60-64.* However, on direct examination, Adams testified that he first asked Mr. Shields about the note and then asked Mr. Shields about Movie Magic. *Doc. 29-2 at 582.*

shotgun. *Doc. 29-2 at 298-299, 303*.  At Adams' request, Mr. Shields provided the following written statement:

> Well, I knew about the murder at Movie Magic[,] and I [know] who did it.  The gun that was used was a 4-10, and Kuntrell Jackson used that gun to kill the woman. The gun is somewhere out by the graveyard.  He told me that he did it.

*Doc. 29-2, at 306, 544*.  Adams, at this point, was unaware that investigators had reason to believe that Laurie Troup had been shot with a .410 shotgun. *Doc. 29-2 at 300*.  But after he obtained Mr. Shields' statement, Adams consulted Thompson, who filled him in on details about the Movie Magic crimes. *Doc. 29-2 at 200, 313*.

The morning of March 27, 2001, Adams and Thompson interviewed Mr. Shields, who told them that the .410 shotgun could possibly be found near a cemetery.  He explained that the day after the Movie Magic shooting, other people brought the shotgun to his house, and he suggested they hide it in a ditch near the cemetery.  *Doc. 29-2 at 302*.  Adams and Thompson transported Mr. Shields to the ditch he had described, but they did not recover a weapon.  *Doc. 29-2 at 302.*

The afternoon of March 27, 2001, Thompson and Adams interviewed Mr. Shields again, and he confessed having a role in the Movie Magic robbery. A portion of the interview was audio recorded. *Doc 29-2 at 483-515*. At the beginning, Mr. Shields acknowledged that he and the detectives had been discussing the Movie Magic shooting.  *Id. at 483*.  Thompson asked Mr. Shields whether an advice of rights form had been read to him, whether he understood his rights, and whether he

was giving a statement of his own free will. In response to each question, Mr. Shields responded, "Yes sir." *Id*.

Thompson then asked Mr. Shields to start from the beginning and "just tell me what took place." Without additional prompting[,] Mr. Shields admitted his role in the robbery and murder of Laurie Troup:

> A: We start the day before it happened[.] We planned it, talked about it, told 'em we were going to do a lick. So the next day[,] when I walked by O'Bryan's . . .
>
> Q: O'Bryan's who?
>
> A: Kuntrell Jackson, we went over [to] his house, early the next day[.] I['m] sitting there talking about and we told him what was going to go down[.] And I told 'em I had a [.410], I had a [.410] we could use[.] And then[,] . . . later on that day . . . [,] like it was getting' dark[,] I went over [and] told 'em that, we walked to Movie Magic (cannot understand)[.] I was standing by the door[,] and Chester [was] reaching for the gun[,] and O'Bryan was up at the counter and told her, ["]Give me your money[,] hoe[;] just give me your money[."] And the woman just stood there looking around like she was scared[,] and by this time I was still standing by the door[,] and then I left[.] I went down towards down by the liquor store to see if the police [were] coming. On the way back down there[,] I heard a gunshot.
>
> Q: On the way back towards Movie Magic?
>
> A: On the way back toward Movie Magic[,] I heard a gun shots[,] so I looked in on the way back through[,] and I, . . . I [didn't] see her standing up[;] I [saw] the blood on the wall[,] and I [saw] Chester talking [a]bout, man let's go man, and O'Bryan . . . , Kuntrell was holding his shirt and nah, nah man we gotta get some[.] By that time I ran, I had ran towards across the school, and I had ran to the projects[.] By the time I got cross the school, . . . I [saw] them coming behind me[,] coming out of the store[,] coming around the corner from the store[,] and I ran all the way to the projects[,] and we met up in the projects[.]

That's when I asked them where the gun was thrown . . . . They [were] like[,] dude it's on Travis Booker, man[.]  He got the gun[;] he came back with the gun, and I told him, Go.  I went home[.] The next day[,] he came over [to] my house with the gun.  Him, O'Bryan, Chester and Travis.  Chester went home[;] it was O'Bryan and Travis came to my house with the gun[,] and I told him[,] you need to get the gun off my property 'cause I don't want to have nothin' to do with it[;] I wasn't there[.]  And I told 'em[,] take the gun over there[,] behind the corner from my house there was a grave yard[,] throw it out there or something[;] there's a ditch with some water or something like that[;] throw it out there, if ya'll did something to it[.] And then we took it over there and I told 'em[,] I don't want to hear nothing else about it[,] and I'm serious.

*Doc. 29-2 at 485-486*.

In response to questions that followed Mr. Shields' uninterrupted narrative, he clarified that Chester Jackson, Kuntrell Jackson, and Travis Booker had accompanied him to Movie Magic. *Doc. 29-2 at 485*.  He described the weapon as a sawed-off, single-shot, .410 shotgun, with tape wrapped around it (*Doc. 29-2 at 493*), which he had purchased from an "older guy." *Doc. 29-2 at 504*.  Mr. Shields stated that Chester Jackson had the .410 in "down in his coat" at first. *Doc. 29-2 at 490-491*. He recalled that Chester was wearing a Dallas Cowboys coat but described the coat as red and black.  *Id*.  Mr. Shields said that Kuntrell Jackson took the gun from Chester and pointed it at Laurie Troup (*Doc. 29-2 at 493*), and after they reunited at the projects,[18] Kuntrell said, "I shot the bitch."  *Doc 29-2 at 485*.

---

[18]  Evidence at trial established that "the projects," also known as Chickasaw Courts, was an area between 11th and 12th (or Division) Streets in Blytheville, west of the railroad tracks; Kuntrell Jackson's house was on Dougan Street, east of the railroad tracks; Movie Magic was

Without prompting, Mr. Shields volunteered that the robbery, as planned, did not include a shooting, and that he personally had a bad feeling about what would happen:

> [Shields]: The plan was to go in and get money and leave[;] that's it[;] wasn't no shooting or none of that gonna go down[.] It went wrong, but I felt it, I knew something was gonna happen.
>
> [Detective]: Why is that?
>
> [Shields]: Cause I just got a feeling man, man, I, I, I know, I know[,] I just wasn't feeling right[;] something was messed up and I had a feeling something was going to go wrong[.] I'm a Christian[.] I'm [indecipherable][;] he didn't even know what was going on, I had a feeling something was going on.

*Doc. 29-2, at 512.*

The next day, March 28, 2001, Mr. Shields requested to speak to an officer, and he altered his statement in one significant respect: He stated that Chester Jackson was not involved in the Movie Magic crimes. *Doc. 29-2 at 322-324.*

After obtaining Mr. Shields' statement, Adams and Thompson arrested Kuntrell Jackson,[19] and on March 30, 2001, they traveled to Nebraska and

---

located in a shopping center off of 6th Street; and Mr. Shields' house was located on West Holley, four to five blocks from the projects. *Doc. 19-2 at 332, 334.*

[19] Kuntrell Jackson provided a statement to detective Thompson, admitting a role in the Movie Magic robbery, but he identified Mr. Shields as the shooter. *Jackson v. State*, 359 Ark. 87, 90 (2004). The State charged Kuntrell Jackson with capital felony murder and aggravated robbery, a jury convicted him as charged, and he received a sentence of life without parole. *Id.* Mr. Shields contends that Mr. Jackson knows that he is innocent and "testified falsely to the contrary." *Doc. 55 at 2.* However, the jury in Mr. Shields' criminal trial heard *no* evidence regarding the details of Kuntrell Jackson's statement, and Mr. Jackson *did not* testify at Mr. Shields' trial.

interviewed Mr. Booker, who provided an audio-recorded statement. *Doc. 29-2 at 386-387, 547-563.* Before Mr. Booker talked, the detectives told him that Mr. Shields had identified him as an accomplice in the Movie Magic crimes (*Doc. 29-2 at 278),* and at the beginning of his recorded statement, Mr. Booker acknowledged that he and the detectives had "gone over quite a few things" and that Mr. Booker had drawn a diagram of the Movie Magic crime scene. *Doc. 29-2 at 549.*

With his statement, Mr. Booker recounted that in November 1999, he, Derrick Shields, and Kuntrell Jackson were sitting around at the projects, when Mr. Shields showed them a sawed-off shotgun. *Id.* Mr. Booker recalled that "someone" came up with a plan to rob Movie Magic and that Mr. Shields agreed that he would bring the gun. *Doc. 29-2 at 550.* Like Mr. Shields, Mr. Booker recalled that it was just getting dark when he, Mr. Shields, and Mr. Jackson walked to Movie Magic. *Doc 29-2 at 558.* Contrary to Mr. Shields' statement, Mr. Booker recalled that Mr. Shields pointed the gun at Laurie Troup and demanded money, Ms. Troup responded that she had no money and threatened to call the police, and Mr. Shields "fired a shot and we all ran." *Id.*

Mr. Booker told Adams and Thompson that after Mr. Shields fired the gun, they all ran to Mr. Jackson's house on Dougan Street, where they left the weapon (*Doc. 29-2 at 554-555*), which he described as a .410, sawed-off shotgun. *Doc. 29-2 at 550-551.* He told the detectives that Kuntrell Jackson was wearing a blue and

grey Dallas Cowboys jacket and that he was wearing a black and gold Minnesota Vikings Coat. *Doc. 29-2 at 553*.

Mr. Booker was charged with capital murder and aggravated robbery, but he eventually pleaded guilty to second-degree murder in return for a thirty-five- year sentence. *Doc. 29-2 at 274-275*. Mr. Booker testified for the prosecution in Mr. Shields' criminal case, and the details of his testimony matched the statement he gave on March 30, 2001, with the exception that he specifically identified Mr. Shields as the person who came up with the idea of committing the robbery.

On cross-examination, Mr. Booker admitted that he and prosecutors discussed his parole eligibility and that he would serve only a fraction of his thirty-five-year sentence (*Doc. 29-2 at 277*); he denied that his cousin, Mario "Bowlegs" McNichols, was present during the Movie Magic robbery and murder (*Doc. 29-2 at 278*); and he denied telling fellow inmates that Mr. Shields was not present at Movie Magic. *Doc. 29-2 at 278-282*.

## II.    DISCUSSION

### A.    Mr. Shields Has Procedurally Defaulted his Federal Habeas Claims

The exhaustion requirement mandates that an application for a writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). When a petitioner fails to fully exhaust his claims in state court and the time for doing so has

expired, his claims are procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).

A petitioner can obtain federal habeas review of a procedurally defaulted claim only if he can demonstrate: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice, such as the conviction of one who is actually innocent. *Coleman*, 501 U.S. at 750.

Mr. Shields concedes that he failed to present any of the claims he pursues in this habeas action in state court, but he argues that his failure to exhaust state remedies is excused because Arkansas' post-conviction system is structurally and procedurally inadequate. Judge Deere correctly determined that because Mr. Shields has procedurally defaulted and thus technically exhausted his claims in state court, the only question remaining is whether his procedural default is excused by an adequate showing of cause and prejudice or actual innocence. *Doc 34 at 17-18* (citing *Welch v. Lund*, 616 F.3d 756, 760 (8th Cir. 2010) (noting that reliance on 28 U.S.C. § 2254(b)(1)(B) is "misdirected" when claims are technically exhausted and procedurally defaulted)).

## B. Mr. Shields Has Failed to Establish Cause and Prejudice

Mr. Shields proposes that the Court excuse the procedural default of his ineffective assistance at trial claims pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012)

and *Trevino v. Thaler*, 569 U.S. 413 (2013). For reasons that follow, neither case permits the Court to review Mr. Shields' procedurally defaulted claims, and nothing presented in the expanded record alters this conclusion.

In *Martinez*, the Supreme Court held that when a state requires a defendant to raise an ineffective assistance of trial counsel claim in an initial-review collateral proceeding, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez,* 566 U.S. at 17. The *Martinez* Court explicitly declined to base its decision on constitutional grounds, such as a right to counsel in collateral proceedings, and described it as an "equitable ruling." *Martinez*, 566 U.S. at 13-14. In *Trevino*, the Supreme Court held that the *Martinez* exception also applies where the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal. . . ." *Trevino*, 569 U.S. at 429.

Arkansas law generally requires that a criminal defendant raise ineffective-assistance-of-counsel claims in an initial petition under Rule 37 of the Arkansas Rules of Criminal Procedure. *Sasser v. Hobbs*, 735 F.3d 833, 853 (8th Cir. 2013) (finding that Arkansas's post-conviction appeal process does not "as a systematic

18

matter," afford indigent defendants a "meaningful review of a claim of ineffective assistance of counsel" on direct appeal."). But a fundamental prerequisite to the application of *Martinez* is that the petitioner *actually initiated* an initial-review collateral proceeding, either without a lawyer or with an ineffective lawyer, which Mr. Shields failed to do.  See *Thomas v. Kelley*, No. 5:17CV00067-JM-JJV, 2017 WL 2643420, at *3 (E.D. Ark. May 10, 2017), *report and recommendation adopted,* No. 5:17CV00067-JM, 2017 WL 2643253 (E.D. Ark. June 19, 2017) ("The language of the *Martinez* exceptions strongly implies, if not compels, that there must have been a collateral post-conviction proceeding."); *Travis v. Kelley*, No. 517CV00044 SWW-JTR, 2017 WL 4295258, at *5 (E.D. Ark. Sept. 5, 2017), *report and recommendation adopted,* No. 517CV00044 SWW, 2017 WL 4295197 (E.D. Ark. Sept. 27, 2017) (citing cases and noting that "[f]ederal trial courts in Arkansas have consistently held that a habeas petitioner . . . must, at a minimum, initiate the 'initial collateral review proceeding' by filing a Rule 37 petition with the state trial court before he can rely on *Martinez* to excuse his procedural default).

Nevertheless, Mr. Shields believes that *Martinez* applies because he was without counsel during the window of time for filing a Rule 37 petition, and "he was not aware of such a petition or its extremely strict time limitations." *Doc. 10, at 29.* However, the Constitution affords no right to counsel at the post-conviction stage, *Coleman v. Thompson*, 501 U.S. at 752 (citations omitted), and the absence of

counsel provides Mr. Shields neither an independent basis for relief nor a rationale for expanding *Martinez's* reach.

Finally, Mr. Shields argues that his 2016 state habeas petition challenging his life sentence qualifies as an initial-review collateral proceeding. However, for purposes of *Martinez*, such a proceeding is "the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial." *Martinez,* 566 U.S. at 1. In Arkansas, that "first designated proceeding" is one for postconviction relief under Rule 37, not a habeas corpus proceeding. Thus, the *Martinez* equitable exception does not apply and cannot save Mr. Shields' procedurally defaulted claims.

### C.    The Expanded Record Fails to Support a Gateway Claim of Actual Innocence

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court set out a demanding standard for gateway claims of actual innocence: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.

The Eighth Circuit has instructed that a gateway actual innocence claim must satisfy a two-part test: "First, the petitioner's allegations of constitutional error must be supported with new reliable evidence not available at trial." *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001) (citing *Schlup,* 513 U.S. at 327–28). The

evidence is "only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence.'" *Amrine*, 238 F.3d at 1029). "Second, the petitioner must establish 'that it is more likely than not that not that no reasonable juror would have convicted him in light of the new evidence.'" *Amrine*, 238 F.3d at 1029 (quoting *Schlup v. Delo*, 513 U.S. at 327).

The overall theme of Mr. Shields' claim of actual innocence is a coerced confession.  He alleges that Adams and Thompson threatened him with the death penalty and fed him facts to make his confession appear reliable. Then, he argues, the detectives played his recorded confession to Mr. Booker, thus ensuring that Mr. Booker would implicate him.

Mr. Shields proposes that evidence he submitted with his amended petition, should be "weighed along with new evidence that his confession was coerced and false and . . . other new evidence that he is innocent." *Doc. 43 at 22.* According to Mr. Shields, "Judge [Deere] . . erred when she picked apart each piece of evidence that [his] confession was coerced and rejected each as not new." *Doc. 43, at 21.*

Mr. Shields is mistaken. A federal habeas court's step two analysis must include "the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 537 (2006). But consideration of *all evidence* is required *only* if the petitioner first comes forward with *some* new and

reliable evidence of actual innocence. *Id*. (requiring consideration of all evidence where there was no dispute that the petitioner had "presented some new reliable evidence"). After reviewing the record, the Court agrees with Judge Deere's finding that Mr. Shields' proposed new evidence, submitted with the amended petition, fails to qualify as new and reliable evidence as required under *Schlup.*

The Court now turns its focus to carefully examine the "expanded record,"[20] that is, the additional evidence Mr. Shields presented in objecting to Judge Deere's earlier recommendation (*Doc. 34*). For the reasons explained below, the Court reaches the same conclusion: Mr. Shields has failed to present new, reliable evidence of actual innocence under *Schlup's* first prong.

### 1.    Shields Declaration

First, Mr. Shields presents his own declaration, dated June 18, 2020. *Doc. 42-1*. There, he states that on May 26, 2020, he unexpectedly met Kuntrell Jackson in a Walmart parking lot in Blytheville. He describes a heated back and forth,[21] after

---

[20]    Much of this evidence was presented, in some form, to Judge Deere. The Court has attempted to identify evidence Judge Deere arguably addressed in her recommended disposition while making its own independent assessment of the additional evidence Mr. Shields presents in support of his gateway actual innocence claim.

[21]    According to Mr. Shields, Mr. Jackson, who was sitting in a Jeep, holding a gun, beckoned him to approach and told him that he had been looking for him because he had heard that Mr. Shields was "out for him." *Doc. 42-1 at 4*. Mr. Shields responded that he was not "out for him" and was only upset that Mr. Jackson had recently written a book implicating Mr. Shields in the robbery and murder of Laurie Troup. *Id. at 4-5*. According to Mr. Shields, Mr. Jackson then accused him of being a "snitch," and Mr. Shields explained that police had pressured him to say that Mr. Jackson and Mr. Booker were involved in the Movie Magic crimes. *Id. at 5*.

which, according to Mr. Shields, Mr. Jackson conceded, "Everyone in Blytheville knows that it was Travis who did that shit at the Movie Magic and that you weren't there." *Id. at 5*.

Mr. Shields recalls that he urged Mr. Jackson to come to court and tell the truth, and the conversation ended with Mr. Jackson producing his and Mr. Booker's phone numbers and telling Mr. Shields to have his lawyers call. *Id*. However, Mr. Shields states that Mr. Jackson has refused to publicly declare Mr. Shields' innocence. *Id. at 7*.

The Eighth Circuit has defined *reliable* evidence as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Kidd v. Norman*, 651 F.3d 947, 951-52 (8th Cir. 2011) (quoting *Schlup*, 513 U.S. at 324), *cert. denied*, 568 U.S. 838 (2012). Mr. Jackson's perception of what "everyone in Blytheville knows" lacks reliability because its basis is rumor and gossip, not trustworthy eyewitness accounts. Mr. Shields' own testimony indicates that Mr. Jackson is less than credible and has constantly shifting stories about what happened on November 18, 1999. For example, in his declaration, Mr. Shields states that a month before the Walmart meeting, Mr. Jackson published a book that contained "lies" about Mr. Shields' involvement in the robbery and murder of Laurie Troup. *Doc. 42-1, at 5, ¶ 20*.

In addition to lacking reliability, the content of Mr. Jackson's purported statement fails to contradict Mr. Shields' confession, in which he stated that he stood by the door and did not enter Movie Magic and that he was on the lookout for police when someone else shot Laurie Troup. Furthermore, evidence of Mr. Shields' presence or absence inside the store at the time of the shooting or any other time would not establish his actual innocence. The evidence at trial established that Mr. Shields assisted in planning the robbery, provided the gun, looked out for police, and assisted in hiding the gun the next day. This evidence of Mr. Shields' participation was more than enough to sustain his conviction for aggravated robbery and felony capital murder.[22]

---

[22] Mr. Shields was charged with aggravated robbery and capital felony murder under a theory of accomplice liability. Count I of the Information charged that he "acting alone or with one or more persons" committed the crime of aggravated robbery and that "in the course of and in furtherance of that felony, or in immediate flight therefrom, he or an accomplice did cause the death of Laurie Troup." *Doc. 29-2 at 5*. "Under the theory of accomplice liability, when two or more persons assist one another in the commission of a crime, each is criminally liable for the conduct of all. *Lawshea v. State*, 2019 Ark. 68, 5, 567 S.W.3d 853, 856 (2019) (citing Ark. Code Ann. § 5-2-403(a) (Repl. 2013)). The trial court correctly instructed Mr. Shields' jury as follows:

In this case the state does not contend that Derrick Shields acted alone in the commission of the offense of capital murder and aggravated robbery. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of the offense. An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense: Solicits, advises, encourages or coerces the other person to commit the offense; or Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

*Doc. 29-2 at 407*.

### 2.    Kulpanowski Declaration

Second, Mr. Shields presents the declaration of Virginia Kulpanowski, an investigator hired by his lawyers. *Doc. 42-2*. Ms. Kulpanowski recounts a June 2020 phone conversation she had with Crystal Rogers, a mutual friend of Mr. Shields and Mr. Jackson. She states that Rogers told her that sometime after Mr. Jackson's conviction for the Movie Magic robbery and murder, he called her from prison and told her that Mr. Shields "had nothing to do with the murder." *Doc. 42-2, at 3*. Rogers told Ms. Kulpanowski that she did not tell Mr. Shields about the conversation because Mr. Jackson told her that he had informed Mr. Shields' attorney that "Shields had nothing to do with the shooting." *Id*. Ms. Rogers has declined to return phone calls, requesting that she provide a declaration attesting to her conversation with Mr. Jackson. *Id*. Ms. Kulpanowski believes that Rogers wants to help Mr. Shields but is afraid to do so. *Id*.

Ms. Kulpanowski's declaration, a hearsay statement recounting her conversation with a non-eyewitness, is not reliable evidence. And even if Ms. Rogers were to provide testimony about her conversation with Mr. Jackson, it would, at best, serve as latter-day, collateral evidence aimed at impeaching Mr. Booker's testimony. *Sawyer v. Whitley*, 505 U.S. 333, 334 (1992) ("Latter-day impeachment evidence seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness' account.").

### 3.    Travis Booker Interviews

Third, Mr. Shields presents a transcript and video of three interviews of Travis Booker conducted in 2013 and 2014 by Rachael Geiser, another investigator hired by his lawyers.[23] *Docs. 42-3, 42-4.* Mr. Shields maintains that during the interviews, Mr. Booker recanted his trial testimony, admitted that Mr. Shields is innocent, and indicated that Mario "Bowlegs" McNichols was the third perpetrator in the Magic Movie crimes.[24]

---

[23] These materials add nothing of substance to Ms. Geiser's affidavit, submitted with the amended petition, describing four interviews she conducted with Mr. Booker. *Doc. 10-13.* Judge Deere addressed Ms. Geiser's affidavit in her recommended disposition:

> Mr. Shields asserts that Mr. Booker . . . has made 'numerous statements directly probative' of his innocence. (#10 at 31) As support, Mr. Shields points to the notarized statement of investigator Rachael Geiser which states that Mr. Booker *implied* that Mr. Shields was not present at the crime scene, that Mr. Shields had falsely confessed, and that Mario "Bowlegs" McNichols, not Shields, was involved. (#10 at 31-33) The evidence Mr. Shields offers regarding Mr. Booker's statements is not new. At trial, Mr. Shields' attorney cross-examined Mr. Booker about statements he had made that implicated Mr. McNichols. (#10-2 at 270-72) Further, Mr. Shields called a witness who testified that Mr. Booker had implicated Mr. McNichols. (#10-2 at 357-58) Moreover, Ms. Geiser's affidavit attests that she conducted her interviews with Mr. Booker in 2013 and 2014, over four years prior to the date Mr. Shields filed his petition. (#10-13) . . .
>
> The evidence Mr. Shields points to is not an affidavit with Mr. Booker's recantation; instead, Mr. Shields relies on the affidavit of a private investigator recounting statements allegedly made by Mr. Booker in 2013 and 2014. (#10-13 at 2-4) See *Herrera*, 506 U.S. at 417-18 (affidavits are disfavored, because they are not subject to cross-examination and contain hearsay).

*Doc. 34 at 26-27.*

[24] Mr. Shields states, "Mr. Booker explained that he told police what they wanted to hear about Mr. Shields' involvement in the Movie Magic murder." *Doc. 55 at 2 (citing Doc. 43-4 at 28).* Mr. Shields cites a portion of the interview transcript, where Ms. Geiser asked Mr. Booker whether he remembered telling police that during his time in juvenile detention, a detainee named Brandon Cooper told him that Mr. Shields had shown him a sawed-off shotgun. *Doc. 43-4 at 28.*

The Court has read the transcript and viewed the video of the interviews. Contrary to Mr. Shields' characterization, Mr. Booker *did not* recant his trial testimony and statement to detectives, nor did he admit Mr. Shields' innocence. In fact, Mr. Booker told Ms. Geiser that he was "adamant" that he would not change his statement because he did not trust the local prosecutor (*Doc. 43-4 at 8*), and he specifically denied ever telling Ms. Geiser that Mr. Shields was not present at Movie Magic. *Doc. 43-4 at 30* ("I ain't told you he wasn't there."). Mr. Booker only pointed out that certain details of Mr. Shields' confession did not make sense and did not match his. *Id*. This observation is nothing new. Mr. Shields and Mr. Booker's statements were presented to the jury at Mr. Shields' trial, and Mr. Shields' lawyer pointed out inconsistencies between the two. *Doc. 29-2 at 436*.

As for the subject of Mario McNichols, Mr. Booker told Ms. Geiser that Mr. McNichols, his cousin, gave money to their grandmother, who added it to his prison money account. *Doc. 42-4 at 5*. At no time did Mr. Booker identify Mr. McNichols as the "actual third perpetrator."

---

Mr. Booker responded that the police "brought it up[,]" and he didn't even know Brandon Cooper. Mr. Booker added: "That's what I'm telling you, that we just told them what they wanted to hear." *Id*. The Court has searched the transcript and finds no instance in which Mr. Booker specifically stated that he told the police what they wanted to hear about Mr. Shields' involvement in the robbery and murder.

As Judge Deere observed, even if Mr. Booker provided an affidavit or in-court testimony that Mr. McNichols, not Mr. Shields, was the third perpetrator, it would not qualify as new, reliable evidence of actual innocence:

> The evidence Mr. Shields offers regarding Mr. Booker's statements is not new. At trial, Mr. Shields' attorney cross-examined Mr. Booker about statements he had made that implicated Mr. McNichols. (#10-2 at 270-72) Further, Mr. Shields called a witness who testified that Mr. Booker had implicated Mr. McNichols (#10-2 at 357-58). . .
>
> Mr. Booker's statements implicating Mr. McNichols are dubious, because Mr. McNichols was 12 years old at the time of the murder and is not currently subject to prosecution. (#29 at 10-11) Under Arkansas law, Mr. McNichols cannot be charged as an adult for acts he committed when he was 12. Given that he is now over the age of 21, he cannot be charged as either a juvenile or an extended-juvenile-jurisdiction offender. (#29 at 10-11 (citing *Z.L. v. State*, 2015 Ark. 484 at 3-5 and ARK. CODE ANN. § 9-27-501(a)(1) (Supp. 1999)).
>
> . . . Affidavits incriminating a third party who cannot be prosecuted are to be treated with skepticism. *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring) (affidavits produced at the eleventh hour with no reasonable explanation for the delay and that conveniently blame a dead man are suspect); see also *Jimerson v. Kelley*, 350 F. Supp. 3d 741, 754 (E.D. Ark. 2018) (where petitioner claimed actual innocence based on a co-defendant's confession to committing the crime alone, the evidence of innocence was not strong enough to create doubt about the trial's outcome). Here, the Booker evidence is neither new nor reliable.

*Doc. 34 at 26-28.*

### 4.    Bolan Interrogation

Fourth, Mr. Shields provides a video and transcript of detective Adams interrogating a suspect named John Bolan, who had been identified as a suspect in a 2004 murder described in *Johnson v. State*, 366 Ark. 8, 9 (2006). *Docs. 42-5, 42-6.*

Mr. Shields contends that the video shows Adams feeding facts to Mr. Bolan, "demonstrating his pattern and practice of coercive interrogation tactics." *Doc. 55, at 4*. He claims that Adams used the same tactics on him by threatening him with the death penalty and "[feeding] him facts uncovered during the . . . investigation . . . to make his confession appear to be reliable." *Doc. 55 at 4*.

Evidence of *Mr. Bolan's* 2004 interrogation is not reliable evidence that *Mr. Shields'* 2001 confession was coerced. Nor does it qualify as new evidence for the patent reason that Mr. Shields has at all times known what detectives said and did before and during his confession. What is new is the *claim* that Mr. Shields' confession was coerced. Mr. Shields attacked the admissibility of his confession at trial, on direct appeal, and with his 2004 federal habeas action 2004; but he has never, until now, pursued a claim that Adams and Thompson used coercive means, including threats to seek the death penalty, to induce his confession.

Mr. Shields faults his trial attorney for failing to challenge his confession as the product of coercion. Under the law of this Circuit, a procedurally defaulted ineffective assistance of counsel claim will not transform evidence to "new" for purposes of actual innocence. Evidence is new "only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox,* 238 F.3d 1023, 1029 (8th Cir. 2001). The Eighth Circuit has explicitly declined to adopt an exception for claims asserting that ineffective

assistance of trial counsel caused evidence of innocence to go undiscovered. *Kidd v. Norman*, 651 F.3d 947, 953–54 (8th Cir. 2011) (declining to adopt a broader definition of "new" evidence in cases where a procedurally defaulted claim involves trial counsel's alleged ineffectiveness in failing to discover or present evidence of the petitioner's innocence).

### 5. Marie Jackson

Fifth, Mr. Shields offers a recording and transcript of investigator Geiser's 2013 interview with Marie Jackson, Kuntrell Jackson's mother, in which Ms. Jackson recounts conversations with her son regarding Laurie Troup's murder. *Docs. 42-7, 42-8*. Mr. Shields submitted the same information with his amended petition, by way of Ms. Geiser's sworn statement *(Doc. 10-13)*, and Judge Deere found the evidence neither new nor reliable. *Doc. 34 at 28-29*.

After careful review, this Court agrees with Judge Deere's assessment and makes additional findings.

In the interview, Ms. Jackson recalls two conversations she had with her son, while he was detained in jail after being charged with Laurie Troup's murder. Ms. Jackson said that Kuntrell initially told her that Derrick "killed the lady," and that he and Travis Booker were present. *Doc. 42-8 at 2-3*. However, Ms. Jackson recalled a second conversation, two weeks later, where Kuntrell told her "Derrick wasn't there" and that the reason for his original statement "was because Derrick

told the police that he [Kuntrell] was the one that shot the lady." *Doc. 42-8, at 2*. Importantly, Ms. Jackson stated that the second time she talked to Kuntrell "he didn't tell me who all was there then [during the second conversation]." *Id*. When asked again whether during the second conversation, Kuntrell told her who was there, she repeated: "He didn't tell me, no. [If it] was him, Travis, or Derrick, or whoever else, he didn't say." *Id*.

Ms. Jackson has refused to provide an affidavit about her conversations with her son. *Docs. 10-13 at 2-4, 5-6; 10-19 at 3*. Even if Ms. Jackson were to provide sworn testimony, it would not demonstrate Mr. Shields' actual innocence. The focus of Ms. Jackson's conversations with Kuntrell, as she recalled them, was *who shot Laurie Troup*. Ms. Jackson told Ms. Geiser that Kuntrell told her that "Derrick wasn't there," not that Mr. Shields was not present at any time before or after the shooting or that he was not involved in the robbery.

### 6. **Stella Young**

Sixth, Mr. Shields offers an audio recording and transcript of a February 2017 interview of Stella Young, who is Marie Jackson's sister and aunt to Mr. Booker and Mr. Jackson. *Docs. 42-9, 42-10*. Mr. Shields submitted the same information with his amended petition, by way of investigator Kulpanowski's affidavit, (*Doc. 10-19*), and Judge Deere found the evidence neither new nor reliable. *Doc. 34 at 28-29*.

After careful review, this Court agrees with Judge Deere's assessment and makes additional findings.

Mr. Shields asserts that during the interview, Ms. Young told his lawyer and investigator that "during prison visits over the years[,]" both Mr. Booker and Mr. Jackson told her that Mr. Shields was innocent and that Mr. Booker's cousin, Mario McNichols was the third accomplice in the Movie Magic robbery and murder. *Doc. 55 at 3*. Mr. Shields misstates the content of the interview.

Ms. Young specifically stated that Mr. Booker *did not* tell her anything about Mr. Shields. *Doc. 43-10 at 3.* She stated that Mr. Jackson, on a *single* occasion, told her that he had lied about Mr. Shields because he was mad at Mr. Shields' brother. *Doc. 43-10 at 7, 9*. According to Ms. Young, Mr. Jackson told her that he knew Mr. Booker and Mario McNichols had a plan to rob Movie Magic but that he, Mr. Jackson, *was not there* during the robbery and murder. *Doc. 43-10*. According to Ms. Young, Mr. Jackson told her that he had no part in the crimes and just "walked up on it." *Doc. 43-10 at 8*. Ms. Young said that Mr. Jackson told her that "when he got up there, [Mr. Booker and Mr. McNichols] were already there[,]" (*Doc 43-10 at 7*), and "that girl was laying in the floor." *Doc. 43-7 at 24*.

If one accepts Ms. Young's account of Mr. Jackson's fantastic and convenient story, Mr. Jackson was not even present during the robbery and murder and therefore has no knowledge, based on his own observation, whether Mr. Shields was involved

in the robbery. The content of what Ms. Young told Mr. Shields' lawyer does nothing to demonstrate Mr. Shields' innocence.

### D.   Mr. Shields is Not Entitled to an Evidentiary Hearing

Mr. Shields asserts that if the Court finds that he has not produced evidence sufficient to pass through the actual innocence gateway, which is the case, he is still entitled to an evidentiary hearing. He argues that the "new witnesses" have refused to testify out of fear and should be subpoenaed to testify in court, where he can "finally expose the full truth of what happened during the Movie Magic murder." *Doc. 55 at 5.*

To obtain review of procedurally defaulted claims under an actual innocence theory, Mr. Shields shoulders the burden to present "new evidence that affirmatively demonstrates that he is innocent of the crime for which he was convicted." *Oglesby v. Bowersox*, 592 F.3d 922, 926 (8th Cir. 2010) (quoting *Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006)).  He is not entitled to an evidentiary hearing for the purpose of developing new evidence of actual innocence. *Weeks v. Bowersox*, 119 F .3d 1342, 1353-54 (8th Cir. 1997); *Battle v. Delo*, 64 F.3d 347, 365 (8th Cir. 1995). The "actual innocence" gateway "is not intended to provide a petitioner with a new trial, with all the attendant development of evidence, in hopes of a different result." *Weeks*, 119 F.3d at 1354 (quoting *Battle*, supra).

### III.  CONCLUSION

For the reasons stated,

IT IS RECOMMENDED that:

1.      Petitioner Derrick X. Shields' § 2254 Petition and Amended Petition (*Docs. 1, 10*) be DISMISSED with prejudice.

2.      A Certificate of Appealability ("COA") be DENIED pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases.[25]

DATED this 27th day of July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

---

[25] The COA should be denied because Mr. Shields has not shown that reasonable jurists could debate whether his claims should be resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *See Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003).